**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

CHERYL FOX, et al.,

Plaintiffs,

v. CIVIL ACTION NO. 2:25-cv-00752

HERBERT J. THOMAS MEMORIAL HOSPITAL, et al.,

Defendants.

# MEMORANDUM OPINION AND ORDER

Pending is Defendants S.C. Adkins,[1] City of South Charleston, A. Davis, Andrew Ferrebee, and Jacob Poland's (collectively, the "South Charleston Defendants"), Motion to Dismiss. [ECF No. 12].[2] Plaintiffs responded in opposition, [ECF No. 22], to which the South Charleston Defendants replied, [ECF No. 23]. The matter is ripe for adjudication.

## I. BACKGROUND

This action arises from the February 24, 2024 arrest and subsequent death of Wayne A. Dodson, [ECF No. 1, ¶¶ 2, 16]. On December 23, 2025, Plaintiff Cheryl Fox, as Administratrix of the Estate of Wayne A. Dodson, filed the Complaint against various healthcare providers, individual police officers, and the City of South Charleston, alleging constitutional violations pursuant to 42 U.S.C. § 1983 and state law tort claims. *See generally id.*

---

[1] Officer Adkins is identified in the Complaint as "B.C. Adkins." [ECF No. 1]. Officer Adkins' full name is Samuel Connor Adkins, or "S.C. Adkins." [ECF Nos. 13; 66].

[2] Also pending are the South Charleston Defendant's Motion to Exceed the Page Limit for its Memorandum of Law in Support, [ECF No. 11], and Plaintiffs' Motion to Exceed the Page Limit for Response in Opposition, [ECF No. 21]. For good cause shown, the motions, [**ECF Nos. 11; 21**], are **GRANTED**.

### *A. Initial Interaction and Arrest*

On February 24, 2024, officers of the South Charleston Police Department ("SCPD") were dispatched to Mr. Dodson's residence to conduct a safety check following reports that he might be suicidal. [ECF No. 1, ¶ 16]. SCPD Officers Lassiter and Thompson were the first to arrive on the scene, where Mr. Dodson answered the door accompanied by his two minor daughters. *Id.* ¶ 17. The officers informed Mr. Dodson of an outstanding warrant for his arrest and allowed him to arrange for his mother, Ms. Fox, to retrieve his children before taking him into custody. *Id.*

During the encounter, Mr. Dodson expressed severe anxiety about going to jail and requested permission to turn himself in the following Monday after his daughters returned to their mother. *Id.* ¶ 18. While awaiting Ms. Fox's arrival, additional SCPD officers arrived, including Defendants Officer Andrew Ferrebee ("Officer Ferrebee")[3] and Sergeant A. Davis ("Sgt. Davis"). *Id.* ¶ 19. Mr. Dodson was not handcuffed during this waiting period and was generally permitted to move about his residence unrestricted. *Id.* ¶ 20; [ECF No. 1-2].[4] Body camera footage attached to the Complaint shows Mr. Dodson standing in front of his refrigerator drinking alcohol. [ECF No. 1, ¶ 20]. Sgt. Davis informed Mr. Dodson that the officers had "no problem with him chugging the alcohol," remarking, "you going to chase it with a diet coke real quick." *Id.*; [ECF No. 1-2]. Once Ms. Fox arrived and departed with the children, Officer Ferrebee and Sgt. Davis formally placed Mr. Dodson under arrest using two sets of handcuffs to accommodate his large frame. [ECF No. 13, at 4].

[3] Officer Ferrebee is named in the Complaint as "Sgt. Andrew Ferrebee." *See* [ECF No. 1, at 1–2]. On August 7, 2026, the parties stipulated to amend the case style to "reflect [Officer Ferrebee's] corrected title." [ECF No. 66].

[4] At the motion to dismiss stage, courts may consider body camera footage attached to the complaint so long as the footage is referenced by both parties in their arguments. *Byers v. Painter*, 173 F.4th 155, 158 (4th Cir. 2026) (citing *Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019)). Courts will "construe the video as consistent with the complaint unless it 'blatantly contradicts the plaintiff[s'] allegations." *Id.* (quoting *Doriety v. Sletten*, 109 F.4th 670, 679–80 (4th Cir. 2024)).

As Mr. Dodson was escorted down the steps of his residence, he staggered. [ECF No. 1, ¶ 21]. Body camera footage captures Officer Ferrebee telling Sgt. Davis that he thought Mr. Dodson "took something." *Id.*; [ECF No. 1-2, at 13:39–13:43]. Sgt. Davis responded by instructing Officer Ferrebee to get Mr. Dodson to the jail and not to worry about his obvious intoxication. [ECF Nos. 1, ¶ 21, 1-2, at 13:43].

***B. Transport to Regional Jail and Admission to Thomas Memorial Hospital***

At approximately 1:46 p.m., Officer Ferrebee placed Mr. Dodson in his police cruiser and transported him to South Central Regional Jail ("SCRJ") in Kanawha County, West Virginia. [ECF No. 1, ¶ 22]. Upon arrival, SCRJ booking staff determined that Mr. Dodson was severely intoxicated and refused to accept custody without medical clearance. *Id.*

Officer Ferrebee then transported Mr. Dodson to Herbert J. Thomas Memorial Hospital Association d/b/a Thomas Memorial Hospital ("Thomas Memorial Hospital") for medical clearance. *Id.* ¶ 23. At the hospital, custody was transferred to Defendant Officers Jacob Poland ("Officer Poland") and Samuel Connor Adkins ("Officer Adkins") who restrained Mr. Dodson by handcuffing both of his wrists to the hospital bedrails. *Id.*

Emergency room physician Defendant Andrew S. Morgan, D.O. ("Dr. Morgan"), examined Mr. Dodson and documented that he was awake, interactive, and voicing "no complaints other than wanting to go to sleep." *Id.* ¶ 24. Dr. Morgan noted a medical history of hypertension, hyperlipidemia, diabetes, and sleep apnea. *Id.* These notes, however, stand in contrast to concurrent records created by Defendant Nurse Kyle Lynn Fairchild, R.N. ("Nurse Fairchild"),[5] who logged that Mr. Dodson exhibited "periods of outbursts and incoherence," and was unable to provide a medical history. *Id.* ¶¶ 25, 27, 29.

---

[5] Nurse Fairchild is named in the Complaint as "Kyle Lynne Fairchild." *See* [ECF No. 1, at 1–2]. In her answer to the Complaint, Nurse Fairchild corrects this and identifies herself as "Kyle Lynn Fairchild." [ECF No. 28].

Despite documenting a blood alcohol concentration ("BAC") of .374, Dr. Morgan provided no substantive treatment for acute alcohol intoxication other than directing that Mr. Dodson's handcuffs be removed briefly to elevate his head. *Id.* ¶ 26. Dr. Morgan subsequently discharged Mr. Dodson back to police custody at approximately 3:44 p.m., documenting that he left in an "awakened stable condition." *Id.*

Even after his "discharge," Mr. Dodson remained at the hospital for several hours, during which Nurse Fairchild observed that nursing staff "was unable to readily obtain compliance for monitoring vital signs" due to his "obvious condition." *Id.* ¶ 28–29. She also noted that Mr. Dodson had history of sleep apnea. *Id.* ¶ 29. At 6:25 p.m., Nurse Fairchild entered a nursing note reporting that Mr. Dodson was discharged and turned over to law enforcement, adding: "[l]aw enforcement stated they are trying to decide how to move [Mr. Dodson] into police car." *Id.* ¶ 30.

### *C. Medical Emergency and Subsequent Death*

During Mr. Dodson's hospital stay, Officers Poland and Adkins positioned themselves in and outside his hospital room, with nursing notes indicating that law enforcement remained bedside while Mr. Dodson remained handcuffed to the bedrails by both wrists. *Id.* ¶¶ 28, 30–31. Sometime between 6:25 p.m.—when Nurse Fairchild last checked on him—and 7:23 p.m., Mr. Dodson vomited and suffered an aspiration event. *Id.* ¶ 32.

At approximately 7:23 p.m., SCPD Officer Dawson arrived at Mr. Dodson's hospital room. *Id.* ¶ 33. Officer Dawson's body camera footage captures his approach to the room, showing Officer Poland seated in a chair outside facing away from Mr. Dodson looking at his mobile phone, while Officer Adkins stood in the doorway observing Mr. Dodson. *Id.* Neither Officer Poland nor Officer Adkins notified medical staff that Mr. Dodson had vomited and appeared to be gasping for breath. *Id.* ¶ 34.

Upon stepping into the room, Officer Dawson observed vomit on Mr. Dodson's face, immediately returned to the hallway, and called for Nurse Fairchild. *Id.* ¶ 35. According to a nursing note created at 7:53 p.m., Nurse Fairchild entered Mr. Dodson's room at 7:26 p.m. *Id.* ¶ 37. Despite "obvious" indicators of a respiratory emergency, including labored breathing, body camera video reflects that Nurse Fairchild "took her time" and wiped Mr. Dodson's face, wiped and replaced his nasal tube, and stood in the room watching him struggle to breathe without calling for emergency assistance. *Id.* ¶¶ 36, 38–39. Officer Dawson stepped into the hallway and shouted for three nurses standing at the end of the hall to come and assist. *Id.* ¶ 39.

Mr. Dodson subsequently became unresponsive and was moved to another room for resuscitation, with medical records noting that his limbs were blue and hypoxic while both of his wrists remained handcuffed to the bed by law enforcement. *Id.* ¶ 40. Dr. William Wade admitted Mr. Dodson to the Intensive Care Unit and diagnosed him with "cardiac arrest, acute respiratory failure with hypoxia, septic shock, lactic acidosis, acute renal failure, liver shock, and acute alcohol intoxication." *Id.* ¶¶ 41–42. Mr. Dodson remained on life support until his death nine days later, on March 4, 2024. *Id.* ¶ 43.

***D. Procedural History and Claims Asserted***

Ms. Fox filed the instant Complaint asserting constitutional claims under 42 U.S.C. § 1983 and state law negligence claims against the City of South Charleston, Officer Ferrebee, Sgt. Davis, Officer Poland, and Officer Adkins, as well as medical malpractice and negligence claims against Dr. Morgan, Nurse Fairchild, and Thomas Memorial Hospital. *See generally* [ECF No. 1]. All individual defendants are sued in their individual capacities. *Id.*

The Complaint sets forth ten causes of action. Counts I and II assert state law claims for both medical malpractice and negligence against Dr. Morgan and Nurse Fairchild, respectively.

*Id.* ¶¶ 44–63. Count III asserts a state law claim for "Medical Negligence" against Thomas Memorial Hospital. *Id.* ¶¶ 64–78. Counts IV and V assert claims pursuant to 42 U.S.C. § 1983 for "Deliberate Indifference of Medical Needs – Failure to Protect"[6] against Officer Ferrebee and Sgt. Davis (Count IV) and Officer Poland and Officer Adkins (Count V). *Id.* ¶¶ 79–115. The remaining counts target the City of South Charleston. Specifically, Count VI asserts a *Monell* claim pursuant to 42 U.S.C. § 1983. *Id.* ¶¶ 116–54. Counts VII through X assert state law claims for negligence, negligent training, negligent supervision, and negligent retention, respectively. *Id.* ¶¶ 155–222.

The South Charleston Defendants now move to dismiss Counts IV–X pursuant to Federal Rule of Civil Procedure 12(b)(6). [ECF No. 12]. The individual defendants argue that they are entitled to qualified immunity. [ECF No. 13, at 9–17]. In their view, the Complaint and the incorporated body-camera footage fail to plausibly allege that Mr. Dodson had an objectively serious medical condition of which they were, or should have been, aware. *Id.* at 11–13, 16. They further contend that even if such a condition existed, their response to it was not objectively unreasonable given that Mr. Dodson was transported for medical evaluation on the same day as his arrest. *Id.* at 15–16.

The City of South Charleston raises several arguments. First, it contends that the *Monell* claim fails for want of any well-pled underlying constitutional violation, and separately for want of factual allegations establishing a policy, custom, or practice beyond this single incident. *Id.* at 17–20. Second, it argues that it is statutorily immune from the state-law negligence claim under West Virginia Code § 29-12A-5(a)(5), at least as to any policy-making function, and that it cannot

---

[6] Counts IV and V appear to each assert two deliberate indifference claims premised on section 1983—deliberate indifference to medical needs and failure to protect—against Officer Ferrebee and Sgt. Davis (Count IV) and Officer Poland and Officer Adkins (Count V). Defendants' arguments focus solely on the deliberate indifference to medical needs claims, so I likewise also address only those portions of the claims.

be held vicariously liable for the officers' conduct absent a special relationship with Mr. Dodson. *Id.* at 20–25. Finally, it argues that the negligent training, supervision, and retention claims are pled in conclusory terms insufficient to satisfy the requisite pleading standard. *Id.* at 25–28. I address each argument in turn.

## II. LEGAL STANDARD

A motion to dismiss filed under Rule 12(b)(6) tests the legal sufficiency of a complaint. *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008). In resolving a motion to dismiss under Rule 12, the court may not consider "matters outside the pleadings," Fed. R. Civ. P. 12(d). Specifically, the court considers only those "documents attached or incorporated into the complaint." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011). However, the court may consider body camera footage attached to the complaint so long as the footage is referenced by both parties in their arguments. *Byers v. Painter*, 173 F.4th 155, 158 (4th Cir. 2026) (citing *Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019)). Courts will "construe the video as consistent with the complaint unless it 'blatantly contradicts the plaintiff[s']' allegations." *Id.* (quoting *Doriety v. Sletten*, 109 F.4th 670, 679–80 (4th Cir. 2024)).

Generally, a pleading under the Federal Rules of Civil Procedure requires only "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). "When ruling on a motion to dismiss, courts must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff." *Farnsworth v. Loved Ones in Home Care, LLC*, No. 2:18-CV-01334, 2019 WL 956806, at *1 (S.D. W. Va. Feb. 27, 2019) (Goodwin, J.) (citing *E.I. du Pont de Nemours & Co.*, 637 F.3d at 440). These factual allegations, taken as true, must "state a claim to relief that is plausible on its face." *Robertson v. Sea Pines Real Est. Cos.*, 679 F.3d 278, 288 (4th Cir. 2012) (quoting *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 678 (2009)). The plausibility standard is not a probability requirement, but "asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). Although "the complaint must contain sufficient facts to state a claim that is plausible on its face, it nevertheless need only give the defendant fair notice of what the claim is and the grounds on which it rests." *Hall v. DIRECTV, LLC*, 846 F.3d 757, 765 (4th Cir. 2017). Thus, "a complaint is to be construed liberally so as to do substantial justice." *Id.*

## III. DISCUSSION

### *A. Section 1983 Deliberate Indifference Claims — Individual Officers (Counts IV–V)*

Pursuant to 42 U.S.C. § 1983, "[e]very person who, under color of [state law], subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." Nevertheless, under the doctrine of qualified immunity, government officials are shielded "from liability for civil damages" for the alleged deprivation of federal rights so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (per curiam); *Harrold v. Hagen*, 174 F.4th 393, 401 (4th Cir. 2026) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).

The qualified immunity inquiry is a two-step analysis: "a plaintiff [must] show[] both (1) that the official violated a constitutional right[,] and (2) that the right was clearly established at the time of the violation." *King v. Blackwood*, 180 F.4th 562, 569 (4th Cir. 2026) (citing *Pearson*, 555

U.S. at 232). "If the answer on either question is 'no,' the officer being sued is entitled to qualified immunity." *Harrold*, 174 F.4th at 402.

"To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (cleaned up). Existing precedent "must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). Courts must not define the right "at a high level of generality," *City & County of San Francisco v. Sheehan*, 575 U.S. 600, 613 (2015), but rather with a high degree of specificity focused on the concrete factual context the official confronted. *See District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018).

The Fourteenth Amendment Due Process Clause protects pretrial detainees from deliberate indifference to serious medical needs. *See Short v. Hartman*, 87 F.4th 593, 608–11 (4th Cir. 2023); *Belcher v. Oliver*, 898 F.2d 32, 34 (4th Cir. 1990). To state a claim for deliberate indifference to a pretrial detainee's serious medical needs, a plaintiff must plausibly allege:

> (1) they had a medical condition or injury that posed a substantial risk of serious harm; (2) the defendant intentionally, knowingly, or recklessly acted or failed to act to appropriately address the risk that the condition posed; (3) the defendant knew or should have known (a) that the detainee had that condition and (b) that the defendant's action or inaction posed an unjustifiably high risk of harm; and (4) as a result, the detainee was harmed.

*Short*, 87 F.4th at 611. The governing standard is objective: it is enough that a defendant's conduct was objectively unreasonable in the face of a known or obvious risk. *Id.* While a plaintiff need not show subjective, conscious disregard, negligence alone remains insufficient. *Id.* at 611–12.

**1. Defendants Ferrebee and Davis (Count IV)**

In Count IV,[7] Plaintiffs allege that Officer Ferrebee and Sgt. Davis acted with deliberate indifference to Mr. Dodson's medical needs by allowing him to consume alcohol at his home prior

[7] Count IV is labelled "Count I" in the Complaint, but I refer to it as Count IV because it appears between Counts III

to arrest, ignoring his intoxication, transporting him to the regional jail rather than directly to a medical facility, and failing to secure immediate medical attention. [ECF No. 1, ¶¶ 101–08]. Defendants Officer Ferrebee and Sgt. Davis move to dismiss Count IV, arguing that the factual allegations fail to demonstrate an objectively unreasonable failure to provide care and that they are entitled to qualified immunity. I agree.

I assume, *arguendo*, that Mr. Dodson's severe intoxication constituted a medical condition that posed a substantial risk of serious harm. However, where no physician has yet diagnosed a condition, the medical need must be one that is "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016) (quoting *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008)). Here, while the Complaint establishes that Officer Ferrebee and Sgt. Davis knew Mr. Dodson had consumed alcohol and observed him stagger on the steps, the well-pleaded facts and attached body-worn camera footage fail to demonstrate that Mr. Dodson was experiencing acute medical distress at the time or an obvious medical emergency while in their presence. There are no allegations that Mr. Dodson was aspirating, unconscious, lethargic, or suffering respiratory distress while at his residence or during transit to the jail. Merely pleading that officers knew an arrestee was intoxicated is insufficient to establish an objectively serious medical condition demanding immediate emergency intervention. *See Grayson v. Peed*, 195 F.3d 692, 696 (4th Cir. 1999).

However, even if a reasonable officer would have known of the risk Mr. Dodson's condition posed at the time of his arrest, Plaintiffs' claims fail on the remaining elements because Plaintiffs have not plausibly alleged that Officer Ferrebee and Sgt. Davis actions or inactions posed an unjustifiably high risk of harm.

---

and V, is plainly a scrivener's error, and because Defendants also identify the error in their briefing. *See* [ECF No. 13, at 7].

The Complaint alleges that when regional jail officials declined to accept Mr. Dodson without medical clearance due to his level of intoxication, Officer Ferrebee promptly transported Mr. Dodson to Thomas Memorial Hospital for evaluation. [ECF No. 1, ¶¶ 22–23]. Far from disregarding a risk of harm, Officer Ferrebee ensured that Mr. Dodson was taken to the hospital to be evaluated by medical staff. To hold that officers act with deliberate indifference merely by transporting an intoxicated suspect to a detention center prior to a hospital would improperly "mandate as a matter of constitutional law that officers take all criminal suspects under the influence of drugs or alcohol to hospital emergency rooms rather than detention centers." *Grayson*, 195 F.3d at 696 ("That would be a startling step to take.").

Furthermore, Plaintiffs fail to plead that the initial decision to attempt booking at SCRJ prior to seeking medical clearance had any detrimental or causal impact on Mr. Dodson's ultimate medical outcome. Mr. Dodson's fatal medical crisis occurred hours later, while under hospital care, during an aspiration event between 6:25 p.m. and 7:23 p.m. [ECF No. 1, ¶ 32]. There is no allegation that Mr. Dodson's condition seriously deteriorated during the brief transport by Officer Ferrebee, nor is there any factual basis to impute liability to Sgt. Davis, whose involvement ceased entirely upon Mr. Dodson's departure from his residence.

Sgt. Davis's recorded remark regarding Mr. Dodson "chugging" alcohol or "chasing it with a Diet Coke," while casual, and may be in bad taste, does not amount to an actionable constitutional violation. *Id.* ¶ 20. The Constitution does not prohibit law enforcement from failing to stop a non-custodial individual from consuming alcohol in his own home prior to formal arrest, nor do these interactions demonstrate an objectively unreasonable disregard for a known, life-threatening medical emergency.

Because Defendants Officer Ferrebee and Sgt. Davis acted reasonably by ensuring Mr. Dodson received prompt hospital evaluation upon learning that jail facility clearance was required, their conduct did not violate Mr. Dodson's constitutional rights. Furthermore, existing precedent did not place every reasonable officer on notice that transporting an intoxicated but conscious arrestee to a jail before a hospital constitutes deliberate indifference.

Accordingly, Defendants Officer Ferrebee and Sgt. Davis are entitled to qualified immunity, and dismissal of Count IV is **GRANTED**.

**2. Defendants Poland and Adkins (Count V)**

In Count V, Plaintiffs assert a Section 1983 claim for deliberate indifference to serious medical needs against Officer Poland and Officer Adkins. [ECF No. 1, ¶¶ 109–15]. Unlike their fellow officers involved in the initial transport, Officer Poland and Officer Adkins *were* responsible for Mr. Dodson once at the hospital and were stationed directly with Mr. Dodson inside Thomas Memorial Hospital after he was returned to law enforcement custody following his purported "discharge." *Id.* ¶¶ 23, 30–31. Officer Poland and Officer Adkins move to dismiss Count V, arguing that the Complaint fails to state a plausible constitutional violation and that they are protected by qualified immunity. [ECF No. 13, at 15–16]. Viewing the allegations and attached body-worn camera footage in the light most favorable to the Plaintiffs, I conclude that dismissal is not warranted at this stage.

To satisfy the first element of a deliberate indifference claim, Plaintiffs must establish an objectively serious medical condition or injury posing a substantial risk of serious harm. *See Short*, 87 F.4th at 611. Here, the Complaint easily satisfies this threshold as to Officer Poland and Officer Adkins. Following an initial presentation with a blood alcohol concentration of .374, severe incoherence, and "periods of outbursts," Mr. Dodson subsequently vomited, suffered an aspiration

event, and experienced acute respiratory distress while handcuffed by both wrists to a hospital bed. [ECF No. 1, ¶¶ 26, 29, 32]. This severe respiratory crisis and subsequent hypoxia clearly constitute an objectively serious medical condition posing a substantial risk of death or serious harm.

Turning to the remaining elements—whether the officers acted in an objectively unreasonable manner and should have known of the condition and risk—the well-pleaded facts and properly-considered exhibits establish a plausible claim against Officers Poland and Adkins. The Complaint alleges that between 6:25 p.m. and 7:23 p.m., Mr. Dodson vomited and aspirated while under the direct supervision of Officers Poland and Adkins, who were positioned inside and immediately outside his hospital room. [ECF No. 1, ¶¶ 30–32]. Officer Dawson's body-worn camera footage captures Officer Poland seated outside the room facing away and looking at his cell phone, while Officer Adkins stood in the doorway. *Id.* ¶ 33. Despite being stationed bedside, neither officer notified medical staff that Mr. Dodson had vomited, was in visible distress, or appeared to be gasping for breath. *Id.* ¶ 34. It was only when Officer Dawson entered the room, observed vomit on Mr. Dodson's face, and alerted nursing staff that any intervention was initiated. *Id.* ¶ 35.

Under these circumstances, a reasonable officer guarding a heavily intoxicated, handcuffed detainee who has vomited and is struggling to breathe would recognize the obvious risk of aspiration and respiratory failure. This is particularly so considering Officers Poland and Adkins knew or should have known of Mr. Dodson's condition since Dr. Morgan diagnosed his BAC as .374 and "ha[d Mr. Dodson's] handcuffs removed long enough to raise him up in the bed and elevate his head." [ECF No. 1, ¶ 26]. Action intended to avoid the very outcome that occurred. Failing to promptly alert medical personnel or take any action during a visible medical crisis that the officers knew or should have known of is "objectively unreasonable" in the face of a known

or obvious risk. *Short*, 87 F.4th at 611 (explaining that an officer's inaction is actionable if it is objectively unreasonable under the circumstances).

Furthermore, Officers Poland and Adkins are not entitled to qualified immunity at this procedural stage. The right of a pretrial detainee to be free from deliberate indifference to serious medical needs—particularly the right to receive timely intervention when experiencing a life-threatening medical emergency or aspiration event while in custody—was clearly established at the time of the incident in February 2024. *See Short*, 87 F.4th at 611–12; *Scinto*, 841 F.3d at 225. Accepting the allegations in the Complaint as true, every reasonable officer would have understood that ignoring a handcuffed detainee gasping for breath and covered in vomit violates the Fourteenth Amendment.

Accordingly, because the Complaint plausibly alleges that Officers Poland and S.C. Adkins acted with objective unreasonableness in failing to seek immediate medical assistance during Mr. Dodson's respiratory emergency, the Motion to Dismiss Count V is **DENIED.**

### *B.* **Monell** *Liability (Count VI)*

Under *Monell*, a municipality may be liable under § 1983 only when its "policy or custom" causes a constitutional violation. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). A municipal policy or custom may be established

> (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train [or supervise] officers that manifests deliberate indifference to the rights of citizens; or (4) through a practice that is so persistent and widespread as to constitute a custom or usage with the force of law.

*Blair v. Appomattox Cnty. Sch. Bd.*, 147 F.4th 484, 493 (4th Cir. 2025) (internal quotation marks omitted); *see also Connick v. Thompson*, 563 U.S. 51, 60–61 (2011); *Bd. of the Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997). Municipal liability, however, may not be premised on a theory

of respondeat superior. *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). "[A] municipality is liable only for its own illegal acts." *Owens v. Baltimore City State's Att'ys Off.*, 767 F.3d 379, 402 (4th Cir. 2014); *see also Connick*, 563 U.S. at 60–61; *Tilley v. Pierson*, 809 F. Supp. 3d 427, 442 (S.D. W. Va. 2025) (Goodwin, J.).

Count Six asserts a *Monell* claim against the City of South Charleston based on a failure to train and supervise and an allegedly unconstitutional policy and custom of "[t]ransporting heavily intoxicate[d], sick, or injured arrestees to the regional jail rather than obtaining medical treatment for arrestees," "[s]hackling intoxicated, sick, or injured arrestees to hospital beds when the arrestee does not pose a flight risk," and "[f]ailing to observe and obtain prompt medical attention for shackled intoxicated, sick, or injured arrestees." [ECF No. 1, ¶¶ 120–21].

A failure to train claim will trigger municipal liability only where "the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton*, 489 U.S. at 388. "A plaintiff must 'identify particular deficiencies in a training program that led to the plaintiff's injuries.'" *Coleman v. Kendall*, 2026 WL 1602111, at *5 (S.D. W. Va. June 4, 2026) (Goodwin, J.) (quoting *Barnes v. Montgomery Cnty.*, 2023 WL 8454633, at *3 (D. Md. Dec. 6, 2023)). "In resolving the issue of a city's liability, the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform." *City of Canton*, 489 U.S. at 389.

An alleged failure to train rises to the level of an unconstitutional custom or policy "only in those situations in which there is a history of widespread abuse." *Wellington v. Daniels*, 717 F.2d 932, 936 (4th Cir. 1983). "[A] municipal policy or custom giving rise to § 1983 liability will not be inferred merely from municipal inaction in the face of isolated constitutional deprivations by municipal employees." *Milligan v. Newport News*, 743 F.2d 227, 230 (4th Cir. 1984); *Myers v.*

*City of Charleston*, No. 2:19-cv-00757, 2020 WL 4195005 at *8 (S.D. W. Va. July 21, 2020) (Johnson, J.) (same). "Because *Monell* liability cannot be predicated on a theory of respondeat superior, a single incident is almost never enough to warrant municipal liability." *Estate of Jones v. City of Martinsburg, West Virginia*, 961 F.3d 661, 672 (4th Cir. 2020) (citing *Semple v. City of Moundsville*, 195 F.3d 708, 713–14 (4th Cir. 1999)). "A municipality is not liable for mere 'isolated incidents of unconstitutional conduct by subordinate employees . . . . Rather, there must be numerous particular instances of unconstitutional conduct in order to establish a custom or practice.'" *Smith v. Ray*, 409 Fed. App'x. 641, 650 (4th Cir. 2011) (quoting *Lytle v. Doyle*, 326 F.3d 463, 473 (4th Cir. 2003)).

Here, the Complaint makes no mention of the type or scope of training the deputies received, identifies no prior incidents, and provides no facts describing any alleged deficiencies in the deputies' training. Nor do Plaintiffs allege any specific instances in support of the *Monell* claim outside of Mr. Dodson's own experience. Instead, the Complaint repeatedly refers generally to the City of South Charleston's alleged failure to properly train its police officers without any factual support. Those bare, conclusory allegations are not enough.

Plaintiffs' failure to supervise claim fares no better. To state a failure to supervise claim under *Monell*, a plaintiff must plausibly allege (1) policymakers had actual or constructive knowledge that their subordinates were engaged in conduct posing a pervasive and unreasonable risk of constitutional injury, (2) their response evidenced deliberate indifference or tacit authorization, and (3) a causal link exists between the inaction and plaintiff's alleged injury. *Wilkins v. Montgomery*, 751 F.3d 214, 226 (4th Cir. 2014) (citing *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994)). A "pervasive and unreasonable risk" requires allegations of widespread conduct occurring on several occasions. *Id.* Again, Plaintiffs identify no prior similar incidents, no

facts suggesting that the City of South Charleston was aware of any pattern of failing to properly monitor and observe its detainees while in a hospital setting, and no allegations tying any policymaker's decisions or inaction to Mr. Dodson's death. In the absence of well-pled facts supporting each element, Plaintiffs' failure-to-supervise claim does not cross the line from possible to plausible under *Twombly* and *Iqbal*.

Count Six's claim that the City of South Charleson maintains a policy of:

> [t]ransporting heavily intoxicate[d], sick, or injured arrestees to the regional jail rather than obtaining medical treatment for arrestees, [s]hackling intoxicated, sick, or injured arrestees to hospital beds when the arrestee does not pose a flight risk, and [f]ailing to observe and obtain prompt medical attention for shackled intoxicated, sick, or injured arrestees

is likewise unsupported by factual allegations from which such a policy or custom could be inferred. [ECF No. 1, ¶ 120]. Plaintiffs plead only a single encounter—Mr. Dodson's own—and offers a speculative conclusion that the City of South Charleston "at all relevant times has maintained policies, customs, or practices that have been the cause, the moving force behind the violation of citizens' rights." *Id*. The Complaint spends the remainder of its time reciting the elements and offering unsupported legal conclusions. And in doing so entirely fails to allege any factual basis to support these allegations as to satisfy federal pleading standards. This kind of "[t]hreadbare recital[] of the elements" cannot establish deliberate indifference or the existence of any widespread practice. *Iqbal*, 556 U.S. at 678.

At this stage in the proceedings, Plaintiffs have failed to sufficiently plead a plausible *Monell* claim against the City of South Charleston. Therefore, Defendants' Motion to Dismiss is **GRANTED** as to Count VI.

### *C. Negligence (Count VII)*

The Torts Claims Act exclusively governs a political subdivision's liability in relation to a civil action for damages claiming injury, death, or loss to persons or property, and its entitlement to certain immunities from those claims. *See* W. Va. Code § 29-12A-1. Pursuant to the Torts Claims Act, the City of South Charleston as a political subdivision[8], is "liable for injury, death, or loss to persons or property caused by the negligent performance of acts by their employees while acting within the scope of [their] employment." W. Va. Code § 29-12A-4(c)(2). However, this liability is constrained by the immunities provided in West Virginia Code § 29-12A-5.

The City of South Charleston[9] asserts immunity from Plaintiffs' direct and vicarious liability claims by operation of West Virginia Code § 29-12A-5(a)(5), which provides that "[a] political subdivision is immune from liability if a loss or claim results from: . . . [c]ivil disobedience, riot, insurrection or rebellion[,] or the failure to provide, or the *method of providing, police, law enforcement or fire protection*." W. Va. Code § 29-12A-5(a)(5) (emphasis added).

I agree as to the City of South Charleston's immunity from direct liability, but disagree as to its immunity for Plaintiffs' vicarious liability claims. I address each in turn.

#### 1. Direct Liability Claims

Paragraphs 160 and 161 of the Complaint set out Plaintiffs' direct negligence claims against the City of South Charleston:

> 160. Upon information and belief, Defendant CSC negligently failed to enforce, adhere to, and implement adequate *policies and procedures* to protect Mr. Dodson from self-harm through allowing him to become extremely intoxicated while in the care, custody, and control of police officers employed by CSC.
>
> 161. Upon information and belief, Defendant CSC failed to follow, institute, maintain, or enforce basic *policies* concerning the safety and care of detainees,

[8] *See* W. Va. Code § 29-12A-3(c) (defining "political subdivision" to include "cities or towns").

[9] Plaintiffs' Complaint does not assert any state law negligence claims against the individually named police officers.

> including Mr. Dodson, who were in the care, custody and control of its police officers, including Defendant Officers.

[ECF No. 1, ¶¶ 160–61] (emphasis added).

However, because these claims demand liability for the City of South Charleston's alleged negligent policy-making functions, the City is immune from liability. The Supreme Court of Appeals of West Virginia has addressed this very scenario, providing that "West Virginia Code § 29-12A-5(a)(5) provides immunity to political subdivisions for 'decision-making or the planning process in developing a governmental policy, including how that policy is to be performed.'" *Monongalia County Commission v. Stewart*, 251 W. Va. 442, 914 S.E.2d 677, 691 (2024) (quoting Syl. pt. 4, in part, *Smith v. Burdette*, 211 W. Va. 477, 566 S.E.2d 614 (2002)). Therefore, to the extent that Plaintiffs seek to hold the City of South Charleston directly liable for its policy making functions, the City of South Charleston is immune from liability pursuant to West Virginia Code § 29-12A-5(a)(5) and those claims are **DISMISSED**. Leaving only Plaintiffs' vicarious liability claims.

**2. Vicarious Liability Claims**

As for the remaining vicarious liability claims asserted against the City of South Charleston for the negligent acts by its police officers,[10] the City of South Charleston similarly argues that it is immune from liability pursuant to W. Va. Code § 29-12A-5(a)(5). I disagree. As made clear in *Stewart*, a political subdivision, such as the City of South Charleston, "is not immune from liability for [a plaintiff's] claims arising from [its officers] alleged negligence to the extent [they were] acting within the scope of [their] employment and 'in furtherance of a method of providing police [or] law enforcement . . . protection." *Stewart*, 914 S.E.2d at 691 (quoting Syl. pt. 5, in part, *Smith*, 566 S.E.2d at 614); *see also* W. Va. Code § 29-12A-5(a)(5).

[10] The City of South Charleston operates the South Charleston Police Department. [ECF No. 1, ¶ 7].

Here, Plaintiffs' vicarious liability claims against the City of South Charleston allege negligent acts by its Defendant officers. And, taking the allegations alleged in the Complaint as true, the officer Defendants were employed as police officers for the SCPD when they were tasked with their respective duties. For Sgt. Davis and Officer Ferrebee, on February 24, 2024, they responded to a safety check and later discovered an outstanding warrant for Mr. Dodson. *See* [ECF No. 1, ¶¶ 16–21]. Officer Ferrebee then transported Mr. Dodson to the local jail and later Thomas Memorial Hospital. *Id.* ¶ 22–23. And at the hospital, custody of Mr. Dodson was transferred to Officers Poland and Adkins. *Id.* ¶ 23. There is no question that all of these actions occurred while the defendant officers were acting "within the scope of [their] employment" and "in furtherance of a method of providing police [or] law enforcement . . . protection." *Stewart*, 914 S.E.2d at 691. Therefore, the City of South Charleston is not immune from liability for Plaintiffs' vicarious liability negligence claims.

Having established that the City of South Charleston is not immune from vicarious liability for the actions of its defendant officers on the date in question, I now address whether these claims survive the dismissal stage.

To succeed on a negligence claim, the plaintiff must establish by a preponderance of the evidence that (1) "the defendant owes [the plaintiff] a duty," (2) "there was a negligent breach of that duty," and (3) "injuries received by the plaintiff resulted proximately from the breach of the duty." *Jones v. Logan Cnty. Bd. of Educ.*, 247 W. Va. 463, 881 S.E.2d 374, 383 (2022) (citation omitted); *see also* Syl. Pt. 1, *Parsley v. Gen. Motors Acceptance Corp.*, 167 W.Va. 866, 866, 280 S.E.2d 703, 704 (1981) ("In order to establish a prima facie case of negligence in West Virginia, it must be shown that the defendant has been guilty of some act or omission in violation of a duty owed to the plaintiff.").

The City of South Charleston contends however that under the public duty doctrine Plaintiffs cannot establish a negligence claim against it. [ECF No. 13, at 21–23]. "Under the public duty doctrine, a government entity or officer cannot be held liable for breaching a general, non-discretionary duty owed to the public as a whole." *West Virginia State Police v. Hughes*, 238 W. Va. 406, 412, 796 S.E.2d 193, 199 (2017). For example, under the public duty doctrine, "the duty to fight fires or to provide police protection runs to all citizens and is to protect the safety and well-being of the public at large[.]" *Wolfe v. City of Wheeling*, 182 W.Va. 253, 256, 387 S.E.2d 307, 310 (1989). However, an exception to the public duty doctrine arises when a "special relationship" exists between the government entity and a specific individual. *Hughes*, 238 W. Va. at 413, 796 S.E.2d at 199. In determining whether a "special relationship" or "special duty" exists, a plaintiff must prove four factors:

> (1) An assumption by the state governmental entity, through promises or actions, of an affirmative duty to act on behalf of the party who was injured; (2) knowledge on the part of the state governmental entity's agents that inaction could lead to harm; (3) some form of direct contact between the state governmental entity's agents and the injured party; and (4) that party's justifiable reliance on the state governmental entity's affirmative undertaking.

*Bowden v. Monroe Cty. Comm'n*, 239 W.Va. 214, 220–21, 800 S.E.2d 252, 258–59 (2017) (citation omitted). Here, I find that sufficient allegations have been pled by Plaintiffs regarding the existence of the special duty exception to the public duty doctrine to survive the City's Motion to Dismiss, but only as to Officers Poland and Adkins.[11]

[11] I find it is unnecessary to evaluate whether Plaintiffs have sufficiently pled a special relationship as to Sgt. Davis and Officer Ferrebee. For many of the same reasons I found qualified immunity for Sgt. Davis and Officer Ferrebee, I similarly find that Plaintiffs have not sufficiently pled a negligence claim against the two Defendants. The Complaint lacks a sufficient factual basis to support the finding that, even if there was a breach, Mr. Dodson's death resulted proximately from the breach. Sgt. Davis's involvement ceased upon Mr. Dodson's transfer to the local jail and Officer Ferrebee's involvement ended when he transferred custody of Mr. Dodson to Officers Poland and Adkins at the hospital. There are no facts to support the assertion that either of their actions resulted or even contributed to Mr. Dodson's untimely death. Therefore, a negligence claim against the City cannot be premised on Officer Ferrebee or Sgt. Davis's involvement.

Taking the allegations as true, and viewing them in the light most favorable to Plaintiffs, the allegations in the Complaint are sufficient to establish that Officers Poland and Adkins had a special relationship with Mr. Dodson as to impose liability on the City.. By assuming custody of Mr. Dodson at the hospital, there are sufficient allegations to support the assertion that the officers took on an affirmative duty to act on behalf of Mr. Dodson if he were to be harmed while in their custody. *See e.g.*, *Maldonado v. Town of Greenburgh*, 460 F.Supp.3d 383, 400 (S.D.N.Y. 2020) ("[W]hen the State assumes physical custody of inmates or detainees, who cannot protect and defend themselves in the same way as those at liberty can, the State owes a duty of care to safeguard those individuals from harm.") (quoting *Case v. Anderson*, No. 16-CV-983, 2017 WL 3701863, at *18 (S.D.N.Y. Aug. 25, 2017)). And, as discussed in the qualified immunity context, the officers should have known that their failure to act in the face of a viable medical crisis—the medical crisis being Mr. Dodson vomiting and aspirating—could lead to harm. And it did. Therefore, Plaintiffs have pled sufficient facts to establish a special relationship exception to the public duty doctrine and accordingly potential vicarious liability on the part of the City for the negligence of its police officers.[12]

Accordingly, the Motion to Dismiss Plaintiffs' Count VII vicarious liability negligence claims against the City of South Charleston is **DENIED**.

---

[12] To the extent that Plaintiffs allege vicarious liability claims against the City of South Charleston for the conscious acts of permitting Mr. Dodson to consume alcohol in its officers' presence, the West Virgina Supreme Court has explicitly indicated that a political subdivision cannot be held liable for the intentional acts of its employees. *Mallamo v. Town of Rivesville*, 477 S.E.2d 525, 533 (1996). Therefore, Plaintiffs cannot pursue against the City of South Charleston any claim for vicarious liability grounded in intentional acts by its officers, and those claims are **DISMISSED**.

***D. Negligent Training, Supervision, and Retention (Counts VIII–X)***

As for Plaintiffs' remaining claims for negligent training, supervision, and retention against the City of South Charleston, the City argues that these claims should be dismissed because Plaintiffs have not alleged sufficient factual allegations to support such claims. I agree.

Under West Virginia law, to state a claim for negligent supervision or training, a plaintiff must show that "[a municipal defendant] failed to properly supervise [an employee officer] and, as a result, [the employee officer] proximately caused injury to the [plaintiff]." *Woods v. Town of Danville, W. V.*, 712 F. Supp. 2d 502, 515 (S.D. W. Va. 2010) (Goodwin, J.) (citing *Taylor v. Cabell Huntington Hosp., Inc.*, 208 W.Va. 123, 134, 538 S.E.2d 718, 725 (2000)).

Plaintiffs have not pled sufficient facts to establish a claim of negligent training or supervision. Plaintiffs generally allege that the City "failed to properly train its employees, including Defendant Officers, to refrain from deliberate indifference to the medical needs of persons who were in their control, custody, and care, and to properly monitor, observe, and supervise persons who were in their control, custody, and care . . . " [ECF No. 1, ¶ 178]. Plaintiffs' negligent supervision claim alleges the same. *See* [ECF No. 1, ¶ 206]. However, these claims contain no factual predicate for its conclusory allegations.

Although "detailed factual allegations" are not required, the Complaint is devoid of the "further factual enhancement" necessary to support Plaintiffs' assertions. *See Twombly*, 550 U.S. at 555, 557 (2007). Without more, Plaintiffs have done nothing more than present a "threadbare recital[ ] of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678. Plaintiffs have set forth no allegations beyond the legal conclusion that Mr. Dodson's death was proximately caused by negligent training and supervision practices. This is exactly the type of conclusory legal rhetoric that is routinely subject to dismissal under Rule

12(b)(6) in this District. *See Mazza v. Deuley*, No. 6:10-cv-00834, 2010 WL 3418318, at *4 (S.D. W. Va. Aug. 26, 2010) (Goodwin, J.) (dismissing negligent hiring and retention claim where plaintiff did "not even attempt to allege a factual predicate" for her claim); *Sullivan v. City of Smithers*, No. 2:08-0337, 2008 WL 1149359, at *7 (S.D. W. Va. Nov. 17, 2008) (Copenhaver, J.) (dismissing negligent hiring, retention, and supervision claim where plaintiff "alleged nothing more than a legal conclusion that [the defendant] was negligent in its selection and retention of" employee).

I find that Plaintiffs have failed to adequately allege facts to support a claim of negligent training or supervision against the City of South Charleston and the claims are accordingly **DISMISSED**.

The City of South Charleston likewise argues that Plaintiffs have not alleged sufficient facts to support its negligent retention claim. The City contends that the allegations contained in the Complaint are "in the form of unsupported legal conclusions couched as factual allegations." [ECF No. 13, at 26–27]. I again agree.

The West Virginia Supreme Court has applied the following test for claims of negligent retention:

> [W]hen the employee was hired or retained, did the employer conduct a reasonable investigation into the employee's background vis a vis the job for which the employee was hired and the possible risk of harm or injury to co-workers or third parties that could result from the conduct of an unfit employee? Should the employer have reasonably foreseen the risk caused by hiring or retaining an unfit person?

*McCormick v. W. Virginia Dep't of Pub. Safety*, 503 S.E.2d 502, 506 (W. Va. 1998). For the same reason that Plaintiffs' claims for negligent training and supervision are inadequate, the Plaintiffs' negligent retention claim is inadequately alleged. The Complaint contains *no* facts related to the City of South Charleston's retention process involving the Officers named in this

action. Instead, the Complaint attempts to disguise legal conclusions as factual allegations, which is insufficient to support a plausible claim for negligent retention. As I noted above, the lack of further factual enhancement renders Plaintiffs' allegations conclusory and insufficient to establish a claim for negligent retention. Accordingly, the motion to dismiss is **GRANTED** as to the claim for negligent retention.

In summary, the negligent training, supervision, and retention claims contained in the Complaint fail to set forth sufficient factual allegations, that if true, show that Plaintiffs are entitled to relief. Accordingly, Plaintiffs' state law negligent training, supervision, and retention claims are **DISMISSED**.

## IV. CONCLUSION

For the reasons set forth above, the South Charleston Defendants' Motion to Dismiss, [ECF No. 13], is **GRANTED IN PART** and **DENIED IN PART**. Specifically, Counts IV, VII, and VIII–X are dismissed. The motion to dismiss as to Count VII is **GRANTED** in as much as it relates to the City of South Charleston's direct liability and **DENIED** as it relates to the City of South Charleston's vicarious liability. The motion to dismiss is otherwise **DENIED**.

The court **DIRECTS** the Clerk to send a copy of this Memorandum Opinion and Order to counsel of record and any unrepresented party. The court further **DIRECTS** the Clerk to post a copy of this published opinion on the court's website, www.wvsd.uscourts.gov.

ENTER: September 29, 2026

JOSEPH R. GOODWIN
UNITED STATES DISTRICT JUDGE